# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

RODNEY TAUREAN LEWIS,
Defendant and Appellant.

S272627

Fourth Appellate District, Division Three
G060049

Santa Clara County Superior Court
B1366626

June 22, 2023

Chief Justice Guerrero authored the opinion of the Court, in which Justices Corrigan, Liu, Kruger, Groban, Jenkins, and Evans concurred.

Justice Kruger filed a concurring opinion, in which Justice Groban concurred.

PEOPLE v. LEWIS

S272627


Opinion of the Court by Guerrero, C. J.


A jury convicted defendant Rodney Taurean Lewis of raping S.D. while she was intoxicated (Pen. Code, § 261, subd. (a)(3))[1] and kidnapping S.D. to commit rape (§ 209, subd. (b)). The trial court sentenced Lewis to a determinate term of eight years in prison for the rape conviction and a consecutive indeterminate term of life imprisonment, with the possibility of parole after seven years, for the kidnapping conviction.

Lewis appealed. As relevant here, he contended the trial court erred by instructing the jury that he could be convicted of kidnapping to commit rape based on the theory that he accomplished the kidnapping by deception rather than by force or fear. Lewis further contended the evidence at trial did not support the required element of force or fear, thus barring retrial on the kidnapping offense.

A divided Court of Appeal agreed with Lewis. (*People v. Lewis* (2021) 72 Cal.App.5th 1, 5 (*Lewis*).) The majority concluded that kidnapping by deception was an invalid legal theory, the trial court erred by including that theory in its instructions, the ordinary force or fear element of kidnapping applied even to intoxicated victims like S.D., and the evidence at trial was insufficient to support that element. (*Id.* at pp. 13–

---

[1]     Subsequent statutory references are to the Penal Code.

19.) One justice disagreed and would have affirmed the judgment on the ground that the ordinary force or fear element did not apply where the victim is intoxicated and unable to legally consent to movement. (*Id.* at pp. 31–32 (conc. & dis. opn. of Bedsworth, J.).)

We granted review to examine the force or fear element of kidnapping in the context of an intoxicated adult victim. We have previously interpreted the kidnapping statute to incorporate a relaxed standard of force where the victim is an infant or small child. (*In re Michele D.* (2002) 29 Cal.4th 600, 610 (*Michele D.*).) We reasoned that infants and children are too young to give their consent to being moved and are therefore "in a different position vis-à-vis the force requirement for kidnapping than those who can apprehend the force being used against them and resist it." (*Ibid.*) Thus, "the amount of force required to kidnap an unresisting infant or child is simply the amount of physical force required to take and carry the child away a substantial distance for an illegal purpose or with an illegal intent." (*Ibid.*) We conclude that an unresisting intoxicated person who is unable to legally consent is similarly vulnerable to victimization, and the Legislature must have intended the relaxed standard of force to apply to such individuals as well.

In his petition for review, the Attorney General did not raise the underlying instructional error found by the Court of Appeal, and the parties have not briefed the issue. Thus, although the Attorney General agrees with the Court of Appeal that deception is an invalid theory of kidnapping even for an intoxicated adult victim, we do not need to consider that question here. Even assuming this instructional error, we conclude it was harmless beyond a reasonable doubt. By its

2

verdict, the jury found that Lewis moved or made S.D. move a substantial distance, beyond that merely incidental to the commission of rape, and it was undisputed at trial that Lewis used some quantum of physical force — he admitted driving S.D. in his car — to accomplish that movement. The jury also found the remaining elements of the offense, including that Lewis had the requisite illegal intent. Any rational juror who made these findings would, based on the evidence at trial, have likewise found Lewis guilty of kidnapping under the relaxed force standard beyond a reasonable doubt. (*In re Lopez* (2023) 14 Cal.5th 562, 589 (*Lopez*).) In other words, "it would be impossible, based on the evidence, for a jury to make the findings reflected in its verdict without also making the findings that would support a valid theory of liability." (*Id*. at p. 568.)

Because the Court of Appeal found prejudicial instructional error, it was unnecessary for it to consider Lewis's other appellate contentions. We therefore reverse the judgment of the Court of Appeal but remand with directions to conduct further proceedings, including addressing any contentions that remain unresolved by this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

During one early morning, a family attending a youth sports game in Palo Alto discovered a young woman lying in some landscaping adjacent to a parking lot. The woman, later identified as S.D., was unconscious and wrapped in a blanket. The family called 911 and waited for emergency personnel to arrive.

Fire department paramedics responded to the scene. S.D. "appeared to be passed out, and right next to a loud freeway." A paramedic pulled back the sheet and found that S.D.'s

underwear was partly pulled down. The paramedic spoke to S.D., and she slowly became more responsive. S.D. told the paramedic she had been at a bar the night before and recalled she had lost her cell phone there. She said a man had approached her, told her he knew where the phone was, and said she should come with him. S.D. did not remember how the night ended or how she came to be in the parking lot. The paramedic suspected S.D. had been sexually assaulted, and he arranged to have her transported to a hospital where she could be examined and treated.

Police officers responded as well. One officer tried to speak to S.D., but she had a difficult time answering questions. S.D. did not understand where she was or what was going on. Her eyes were "very glassy," and she had a dazed look.

The officer eventually accompanied S.D. to the hospital. S.D. became more coherent as time passed. She explained to the officer that she had been at a bar called "Rudy's" the night before and had lost her cell phone. A stranger came up to her and said he knew who had her phone. The stranger appeared to call someone on his own cell phone, and then he suggested they get a drink. They went up to the bar, and S.D. drank some sort of brown liquid in a whiskey glass.

At the hospital, nurses collected blood and urine samples and performed a sexual assault examination on S.D. S.D. told one of the nurses she had pain in her vagina, and she thought it was likely she had had sexual intercourse. But, S.D. said, "I don't remember a single thing." The nurse noted various bruises, abrasions, and other physical indicators which were consistent with S.D.'s belief that she had vaginal intercourse, but not necessarily indicative of sexual assault. S.D.'s blood test

showed a blood-alcohol level of 0.18 percent. Her urine test, converted to blood-alcohol equivalent, reflected a value of 0.23 percent. Testing also revealed the presence of the prescription drug Xanax in S.D.'s urine. S.D. was not prescribed Xanax and had no memory of ever taking it.[2]

Meanwhile, a police detective made an emergency request to S.D.'s cell phone company and obtained the location of her cell phone, which was within a few yards of Rudy's. The detective went to Rudy's, met with the owner, and recovered the phone. The owner and the detective also reviewed surveillance video from inside the bar. (There were no security cameras outside the bar.) Using the video footage, police detectives were able to single out the man who interacted with S.D. They matched the footage to the man's drink purchases and credit card receipts. The receipts identified the man as Rodney Lewis, the defendant here.

At trial, S.D. testified about her memory of the night. She was working at the time as an au pair in a city south of Palo Alto. She was 22 years old. S.D.'s employers had gone on vacation, so she invited a young man over for dinner. They shared a bottle of wine, and after dinner S.D.'s date suggested they go out somewhere. They took a taxi to Rudy's, and S.D.'s date ordered drinks. S.D. thought her drink was too strong, like "pure alcohol," so she only drank around a third of it. S.D. and her date went to the dance floor. At some point, S.D. realized she had lost her phone and walked around the bar looking for it. She felt "somewhat tipsy" but in control. Lewis approached S.D. and asked what she was doing. S.D. said she had lost her phone.

---

[2]   Xanax, combined with alcohol, can cause blackouts and memory loss.

Lewis told S.D. his friend had found a phone. Lewis said he would call the friend, and he put his own phone to his ear. (Lewis's cell phone records do not reflect any calls at that time.) Lewis suggested they have a drink while they waited for Lewis's friend to return. S.D. remembered walking up to the bar, but nothing else from that evening. Her next memory was from the following day at the hospital.

S.D.'s date generally corroborated S.D.'s testimony. They had dinner, shared a bottle of wine, and went to Rudy's. He bought a drink for each of them. Each drink was essentially four shots of liquor with a small amount of soda. He recalled that S.D. lost her cell phone, they were separated, and they met up again after S.D. met Lewis. S.D.'s date was becoming intoxicated, and he lost sight of S.D. He remembered looking for S.D. and eventually leaving Rudy's. He took a taxi back to S.D.'s house, but she was not there, so he slept in his car.

The surveillance video depicts most of the time S.D., her date, and Lewis spent at Rudy's. Lewis arrives alone around 10:45 or 11:00 p.m. He never appears to meet up with anyone, though he tries to talk to and dance with a couple of women. S.D. and her date arrive at around 11:15 p.m. They sit down together in the front bar area. S.D. and her date eventually move to the dance floor and dance together for a while. At approximately 12:30 a.m., S.D. apparently realizes she lost her cell phone, and S.D. and her date return to the front bar area. They separate, and S.D.'s date appears to be speaking with various people. A couple of minutes later, the video captures S.D. and Lewis talking in a different bar area. They walk up to the bar, and Lewis orders two drinks, as well as a shot for S.D. While they wait, Lewis puts his phone up to his ear. S.D. and Lewis lean close to one another; S.D.'s date stands behind them

talking with someone else. S.D. drinks the shot and sips her other drink. Lewis tries to order two more shots, but the bartender initially refuses. After Lewis talks to the bartender, she eventually serves them. Lewis and S.D. each drink a shot. Lewis and S.D. speak with S.D.'s date and then walk to the front of the bar. S.D.'s date follows them but, once in the front bar, he stops and begins to dance. At approximately 12:45 a.m., S.D. and Lewis appear to leave Rudy's.

The bartender who served Lewis had tended bar for 14 years and undergone regular training sponsored by the police department to spot dangerous levels of intoxication in patrons. She remembered interacting with Lewis and S.D. When Lewis attempted to order two more shots, the bartender believed S.D. was too drunk and should not be drinking any more. S.D. was leaning heavily on the bar, "swerving," and "just didn't seem coherent." The bartender recalled telling Lewis, "[L]ook at her. She can barely stand up." Lewis started arguing with the bartender and claimed the shots were not for S.D. Lewis said he knew the owners of the bar and threatened to have the bartender fired. The bartender decided to trust Lewis and serve the shots. She did not see who eventually drank them.[3]

---

[3] A criminalist testified about S.D.'s level of intoxication that night based on the number of drinks S.D. had consumed. Assuming the wine from dinner had been completely metabolized and S.D. drank the equivalent of four or four and a half drinks at Rudy's, her blood-alcohol level would be approximately 0.13 percent. However, working backward from her blood-alcohol level of 0.18 percent the next morning, S.D. would have had a blood-alcohol level of 0.35 percent when she left Rudy's. The criminalist testified it was common for people who have been drinking to underestimate their level of

A detective interviewed Lewis a few days after S.D. was found. Lewis told the detective he was at Rudy's waiting for a friend and ended up meeting S.D. S.D. asked Lewis if he had found her phone. Lewis "thought maybe he knew someone that may have found a phone," and they went outside. Lewis said S.D. was "pretty drunk" and asked for a ride home. In Lewis's car, S.D. was "passing out" but she eventually awoke, started "freaking out," and demanded to leave the car. Lewis said he exited the freeway, tried to convince S.D. to stay, but eventually let her out in a driveway. Lewis initially denied having sex with S.D. But when the detective told Lewis she had a warrant to collect a DNA sample, Lewis changed his story. He admitted they had sex, and he claimed it happened in his car on a side street in Palo Alto. Lewis still maintained that S.D. demanded to be let out of his car afterward. He said he gave her a blanket that he happened to have and left her outside.

A wireless communications expert reviewed data from Lewis's cell phone provider to determine Lewis's location after he left Rudy's with S.D. Lewis made two short outgoing phone calls to his girlfriend at the time and received a third incoming call from her. The third call, which lasted approximately 15 minutes, was initiated at 1:10 a.m. The cell tower data associated with these calls was consistent with a route directly from Rudy's to Lewis's home north of Palo Alto. It was not consistent with a route from Rudy's to the parking lot where S.D. was found.

Lewis testified in his own defense. He said he went to Rudy's that evening to meet a friend, but the friend never

intoxication and to misjudge the number of alcoholic drinks they have consumed.

8

arrived.  Lewis danced with a couple of women, but he denied he was at Rudy's to pick someone up.  Lewis eventually met S.D. on the dance floor, and she told him she had lost her phone.  Lewis said he "thought [he] saw somebody pick something up," but he denied telling S.D. that his friend had found a phone or that he would help her find it.  They chatted and went over to the bar.  The surveillance video shows them leaning close together, and Lewis believes they were kissing briefly.  Lewis bought S.D. a shot as well as another drink that consisted almost entirely of liquor.  Lewis remembered ordering two additional shots, but he claimed they were both for himself.  He did not recall the bartender telling him that S.D. should not drink any more.  Lewis left Rudy's with S.D. and offered her and her date a ride home.  Lewis claimed that S.D. wanted a ride home alone.  They drove a short while, stopped, and had consensual sex.  Lewis said S.D. was "drunk" (as was he) but she was able to consent.  Afterward, Lewis continued to drive S.D. home.  When Lewis was asked on direct examination which direction, he first answered, "North," and then, after further prompting, he said, "South."  While they were driving, S.D. said she wanted to get out, so Lewis let her out.  S.D. seemed "happy" or "relieved" that Lewis let her out, and Lewis gave her a blanket from his car.  Lewis got back on the freeway and went home.  He denied taking S.D. to his house or having sex with her there.

The trial court instructed the jury on the elements of the charged offenses.  For the offense of rape of an intoxicated woman, the instructions required the prosecution to prove (1) "the defendant had sexual intercourse with a woman," (2) "he and the woman were not married to each other at the time of the intercourse," (3) "the effect of an intoxicating or controlled

substance or a combination of both prevented the woman from resisting," and (4) "the defendant knew or reasonably should have known that the effect of an intoxicating or controlled substance prevented the woman from resisting." The instructions further explained, "A person is prevented from resisting if he or she is so intoxicated that he or she cannot give legal consent. In order to give legal consent, a person must be able to exercise reasonable judgment. In other words, the person must be able to understand and weigh the physical nature of the act, its moral character, and probable consequences. Legal consent is consent given freely and voluntarily by someone who knows the nature of the act involved."

For the offense of kidnapping to commit rape, the instructions required the prosecution to prove (1) "the defendant intended to commit rape of a woman while intoxicated"; (2) "acting with that intent, the defendant used physical force or deception to take and carry away an unresisting person with a mental impairment"; (3) "acting with that intent, the defendant moved the person with a mental impairment a substantial distance"; (4) "the person with a mental impairment was moved or made to move a distance beyond that merely incidental to the commission of a rape of a woman while intoxicated"; (5) "when that movement began, the defendant already intended to commit rape of a woman while intoxicated"; (6) S.D. "suffered from a mental impairment that made her incapable of giving legal consent to the movement"; and (7) "the defendant knew or reasonably should have known that [S.D.] was a person with a mental impairment." The instructions went on to state, "A person with a mental impairment may include [an] unconscious or intoxicated adult[] incapable of giving legal consent. A person

10

is incapable of giving legal consent if he or she is unable to understand the act, its nature, and possible consequences. [¶] Deception includes tricking the mentally impaired person into accompanying him or her a substantial distance for an illegal purpose."[4]

In closing arguments, the prosecutor contended that Lewis deliberately plied S.D. with alcohol and Xanax, drove her to his house, and raped her. Afterward, Lewis drove S.D. back to Palo Alto and left her passed out in the parking lot, where she was found the next day. The prosecutor argued that Lewis kidnapped S.D. using both deception and force. Lewis deceived S.D. by claiming his friend had recovered her phone, and he used force against S.D. by taking her forearm and guiding her out of the bar. By contrast, defense counsel argued that S.D. was not intoxicated and she freely consented to sex with Lewis. S.D. voluntarily left the bar with Lewis, and he had no intention of raping her.

Following a half-day of deliberations, the jury convicted Lewis of raping S.D. while she was intoxicated (§ 261, subd. (a)(3)) and kidnapping S.D. to commit rape (§ 209, subd. (b)). After the verdicts, the court and the parties memorialized certain off-the-record discussions regarding jury instructions that had occurred previously. For the offense of kidnapping to commit rape, the court explained that its eventual

---

[4] The court defined "substantial distance" to mean "more than slight or trivial distance. The movement must have increased the risk of physical or psychological harm to the person beyond that necessarily present in the rape of a woman while intoxicated. In deciding whether the movement was sufficient, consider all the circumstances relating to the movement."

jury instruction was a combination of CALCRIM No. 1201 (kidnapping a child or other person incapable of consent) and CALCRIM No. 1203 (kidnapping for the purpose of rape or other offenses). The parties largely agreed to this combination and the language as given, including the reference to movement of a person with a mental impairment. Defense counsel did, however, object to the inclusion of deception as an alternative theory of kidnapping. The trial court overruled the objection. The court likewise denied Lewis's motion for a new trial premised on the same instructional error.

On appeal, as relevant here, Lewis renewed his challenge to deception as a theory of kidnapping. (*Lewis*, *supra*, 72 Cal.App.5th at p. 12.) The Court of Appeal majority agreed that deception was not a valid theory of kidnapping. It observed, "Since 1972, our Supreme Court has repeatedly held asportation by fraud alone does not constitute general kidnapping in California." (*Id.* at p. 13.) However, the majority identified "two lines of cases where courts have recognized a reduced quantum of force was permissible in a kidnapping case." (*Ibid.*) The majority held that neither line, one involving minor victims and another involving incapacitated persons, applied here. (*Id.* at pp. 13–14.) And, in any event, the majority believed the challenged jury instruction allowed the jury to convict Lewis without any showing of force. (*Id.* at p. 16.) The majority further held that the error was prejudicial under *People v. Aledamat* (2019) 8 Cal.5th 1 (*Aledamat*) because, in its view, the evidence at trial did not compel the conclusion that Lewis must have used force against S.D. (*Lewis*, at pp. 17–18.) Indeed, the majority believed there was no evidence of force at all. (*Id.* at p. 19.) It therefore reversed Lewis's conviction for kidnapping

to commit rape and barred retrial based on insufficiency of the evidence.  (*Id*. at p. 23.)

One justice disagreed.  His separate opinion reviewed the applicable precedent and concluded that "kidnapping can — under narrowly drawn exceptional cases — be accomplished without force or fear."  (*Lewis*, *supra*, 72 Cal.App.5th at p. 31 (conc. & dis. opn. of Bedsworth, J.).)  Where, as here, the victim "lacked the capacity to legally consent to being moved, due to her inebriated condition," a jury could convict Lewis of kidnapping based "upon proof that defendant took advantage of [S.D.'s] mental impairment by luring her out the bar under false pretenses for the purpose of raping her."  (*Id*. at p. 32.)  Moreover, even if force or fear were required, the separate opinion posited that the instructional error was harmless because "all [the prosecution] would have had to show is that [Lewis], acting with unlawful intent, used enough force to take and carry [S.D.] away a substantial distance while she was mentally incapacitated."  (*Id*. at p. 33.)  "By driving [S.D.] away from the bar, [Lewis] clearly and indisputably used enough force to move her a substantial distance while the kidnapping was in progress."  (*Ibid*.)  The separate opinion would therefore have affirmed Lewis's kidnapping conviction.  (*Id*. at p. 36.)  We granted the Attorney General's petition for review.

## II.  DISCUSSION

### A.  Kidnapping To Commit Rape

Kidnapping to commit rape is a type of aggravated kidnapping, which is kidnapping "for the purpose of robbery or certain sex offenses."  (*People v. Martinez* (1999) 20 Cal.4th 225, 232 (*Martinez*).)  It is defined by statute: "A person who kidnaps or carries away an individual to commit . . . rape . . . shall be

punished by imprisonment in the state prison for life with the possibility of parole." (§ 209, subd. (b)(1).) Aggravated kidnapping builds on the definition of kidnapping in section 207. (*People v. Daniels* (1969) 71 Cal.2d 1119, 1131.) The statute provides, as relevant here, "Every person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping." (§ 207, subd. (a).) This general offense of kidnapping includes an element of force or fear. We have held it cannot be accomplished by fraud or deception alone. (*People v. Majors* (2004) 33 Cal.4th 321, 327 (*Majors*).)[5]

The parties agree force or fear is required to accomplish the offense of aggravated kidnapping as alleged, and the trial court erred by including deception as an alternative. We note the concurring and dissenting opinion below took a different position. It believed that "kidnapping can — under narrowly drawn exceptional cases — be accomplished without force or fear." (*Lewis*, *supra*, 72 Cal.App.5th at p. 31 (conc. & dis. opn. of Bedsworth, J.).) But the Attorney General did not raise this issue, and the parties have not briefed it, so we have no occasion to consider whether deception is a valid theory under the circumstances here. We assume without deciding that it is not.

We granted review to consider the nature of the force or fear requirement for an intoxicated adult victim. The Attorney General contends the force required to kidnap an intoxicated

---

[5] Other, specialized varieties of kidnapping do not necessarily require force or fear. (See § 207, subds. (c), (d).) These varieties of kidnapping are not at issue here.

adult victim like S.D. is not the same as the force required to kidnap an unimpaired victim. Instead, the force required to kidnap an intoxicated victim is akin to the relaxed force requirement applicable to infants and children. Lewis responds that the relaxed force requirement is inapplicable and contrary to the statute where, as here, the victim is an adult. We conclude the Attorney General is correct.

The relaxed force requirement applicable to infants and children appears to have its origins in *People v. Oliver* (1961) 55 Cal.2d 761 (*Oliver*), a case involving the kidnapping and molestation of a two-year-old boy. The defendant led the boy away by the hand, took him behind a fence, and undressed the boy and himself. (*Id.* at p. 763.) Police officers arrived, witnessed lewd conduct, and arrested the defendant. (*Ibid.*) On the kidnapping charge, the trial court provided the following instruction: " 'To constitute the crime of kidnaping . . . there must be a carrying, or otherwise forcible moving, for some distance of the person who, against his will, is stolen or taken into the custody or control of another person.' " (*Id.* at p. 764.) The instructions did not require any specific intent beyond a general criminal intent. (*Ibid.*)

We noted the child "went willingly with [the] defendant," but he was "too young to give his legal consent to being taken by the defendant." (*Oliver, supra,* 55 Cal.2d at p. 764.) We observed that the traditional rule, under circumstances where the victim is capable of giving consent, did not require any specific intent by the kidnapper: "It is equally true that the forcible moving of a person against his will . . . is kidnaping under . . . section 207, without more, and '[the] purpose or motive of the taking and carrying away [is] immaterial in prosecutions for kidnapping.' " (*Id.* at p. 765.) But such a rule,

as applied to small children, might cover situations where "a minor, unable to give his consent because of his immature years, might be forcibly taken and transported by an adult for a good or innocuous purpose, and in which it would be unthinkable that the adult should be held guilty of kidnaping." (*Ibid*.) By contrast, an adult who transports a child "with an evil and unlawful intent" would "fall within the legislative purpose" and properly be convicted of kidnapping. (*Ibid*.)

We determined that the same logic would apply to "an adult person, who by reason of extreme intoxication, delirium or unconsciousness from injury or illness is unable to give his consent [and] is forcibly carried by another." (*Oliver*, *supra*, 55 Cal.2d at p. 765.) Justice Dooling wrote, "If I forcibly carry a helplessly intoxicated man lying in the middle of the highway to a place of greater safety, if I forcibly take a delirious man or one who is unconscious to a hospital or to a doctor, nobody again could reasonably believe that it was the intention of the Legislature that for any of these acts I could be convicted of kidnaping. But if I forcibly take one of such persons and carry him in the same manner for an evil and unlawful purpose, everybody would again agree that my conviction of kidnaping would fall within the legislative design." (*Id*. at pp. 765–766.)

To resolve this contradiction, we announced an exception to the literal scope of the kidnapping statute. We held that the general rule, "which makes a person who forcibly carries such a person and transports him against his will guilty of kidnaping, however good or innocent his motive or intent may otherwise be, can only lead to obvious injustice and a perversion of the legislative purpose if blindly and literally applied where the person who is forcibly transported, because of infancy or mental condition, is incapable of giving his consent." (*Oliver*, *supra*,

55 Cal.2d at p. 766.) In this situation, "The courts are not powerless to read exceptions into the law when confronted by a criminal statute which literally interpreted would lead to the conviction of crime in cases to which it is obvious that the Legislature cannot have intended the statute to apply." (*Ibid*.) Thus, "as applied to a person forcibly taking and carrying away another, who by reason of immaturity or mental condition is unable to give his legal consent thereto," we construed the statute "as making the one so acting guilty of kidnaping only if the taking and carrying away is done for an illegal purpose or with an illegal intent." (*Id*. at p. 768.)

*Oliver* is notable for two reasons. First, it accepted that the defendant had "forcibly" carried away the two-year-old victim, even though the boy went willingly with the defendant. (*Oliver*, *supra*, 55 Cal.2d at pp. 764–765.) The premise of *Oliver*'s holding was that the statute would have covered the defendant's conduct, but for the exception announced by the court. (*Id*. at p. 766.) Thus, "At the least, our decision in *Oliver* 'indicated that in kidnapping cases the requirement of force may be relaxed where the victim is a minor who is "too young to give his legal consent to being taken" ' " and the kidnapping " 'is done for an illegal purpose or with an illegal intent.' " (*People v. Hill* (2000) 23 Cal.4th 853, 857 (*Hill*).) Second, *Oliver* analogized the situation of a small child to "an adult person, who by reason of extreme intoxication, delirium or unconsciousness from injury or illness is unable to give his consent." (*Oliver*, at p. 765.) *Oliver* therefore broadly described its exception as applying to a victim "who by reason of immaturity *or mental condition* is unable to give his legal consent." (*Id*. at p. 768, italics added.)

Four decades later, we considered the force requirement more directly in *Michele D.*, *supra*, 29 Cal.4th 600. There, a

minor was found to have violated section 207 by kidnapping a 12-month-old infant. (*Michele D.*, at p. 604.) While on a shopping trip with a friend, the minor took the infant from her stroller and walked away. (*Id.* at p. 603.) A witness saw the minor with the infant and took them inside. (*Id.* at p. 604.) Police, who were searching for the infant, arrived and arrested the minor. (*Ibid.*) In appellate proceedings, the minor argued that the evidence was insufficient to show a violation of section 207 because she had not "forcibly seized" the infant. (*Michele D.*, at p. 605.)

We began our discussion by noting that "ordinarily the force element in section 207 requires something more than the quantum of physical force necessary to effect movement of the victim from one location to another." (*Michele D.*, *supra*, 29 Cal.4th at p. 606.) But we held the "minor's conduct falls within the ambit of the statute. Even if force, as conventionally understood, was not used to effect [the infant's] kidnapping, the minor's intent in carrying off the infant still renders her conduct kidnapping." (*Ibid.*)

Like *Oliver*, we were required in *Michele D.* to construe section 207. But, "whereas in *Oliver* we were concerned that a literal construction of the statute might lead to wrongful convictions, in this case a literal construction of the statute might result in the absurd consequence of finding that a kidnapping did not occur where it is clear a kidnapping was intended. Minor removed [the infant] from her stroller with the intention of taking her away and raising her as her own child. Like the Court of Appeal in the present case, 'we find it inconceivable that the Legislature intended the physical taking of an infant in the manner described in these facts not to be the crime of kidnapping. In fact, we believe the taking of an infant

or child in this manner is the prime example of kidnapping and is clearly intended to be within its scope.' " (*Michele D., supra,* 29 Cal.4th at pp. 607–608.)

To "avoid[] the absurd consequence of allowing a defendant who carries off an infant or small child under circumstances similar to those in the present case to escape liability" (*Michele D., supra,* 29 Cal.4th at p. 613), we construed the statute to include a reduced force requirement where the victim is an infant or child. We held, "[T]he amount of force required to kidnap an unresisting infant or child is simply the amount of physical force required to take and carry the child away a substantial distance for an illegal purpose or with an illegal intent." (*Id.* at p. 610.)

The Legislature later codified this standard. (§ 207, subd. (e), added by Stats. 2003, ch. 23, § 1.) The Legislature explained, "The amendment to Section 207 of the Penal Code made by this act codifies the holding in [*Michele D.*], and does not constitute a change in existing law." (Stats. 2003, ch. 23, § 2, p. 99.)

The Court of Appeal applied these precedents to an intoxicated victim in *People v. Daniels* (2009) 176 Cal.App.4th 304 (*Daniels*). The victim in *Daniels* had consumed around 13 shots of alcohol over three to four hours. (*Id.* at p. 308.) After leaving a bar, she ran over to a parking lot, vomited, and passed out. (*Ibid.*) She woke up in an alley with the defendant, but apparently she passed out again. (*Ibid.*) She ended up in the defendant's car, but she did not remember how and did not consent to the movement. (*Ibid.*) The victim continued to alternately vomit and pass out. (*Id.* at pp. 308–309.) At some point, she realized a person was touching her breasts, but she

passed out again. (*Id.* at p. 309.) The defendant drove to a motel and carried the victim up to a room. (*Ibid.*) When the victim realized the defendant had left for a moment, she escaped and sought help from other hotel guests. (*Ibid.*)

For the charged offense of kidnapping to commit rape, the trial court instructed the jury using the relaxed force requirement described in *Michele D.*, i.e., " 'the defendant used enough physical force to take and carry away an unresisting person with a mental impairment' " and, moreover, " 'acting with that intent, the defendant moved the person with a mental impairment a substantial distance.' " (*Daniels*, *supra*, 176 Cal.App.4th at pp. 324–325.) The instructions went on to explain, " 'A person with a mental impairment may include unconscious or intoxicated adults incapable of giving legal consent. The person is incapable of giving legal consent if he or she is unable to understand the act, its nature, and possible consequences.' " (*Id.* at p. 325.)

On appeal, the defendant challenged the relaxed force requirement as inapplicable and inadequate. (*Daniels*, *supra*, 176 Cal.App.4th at p. 326.) The Court of Appeal rejected this challenge based on a direct analogy to *Michele D.* (*Id.* at p. 332.) It held, "An interpretation of . . . section 209, subdivision (b)(1) to avoid the absurd consequence of allowing a defendant to escape liability for carrying off an incapacitated person for the purpose of rape serves the legislative purpose underlying the statute, just as the California Supreme Court's construction of . . . section 207 did in *Michele* [*D.*] [¶] Indeed, under the rationale of *Michele* [*D.*], it is our 'duty' to construe . . . section 209, subdivision (b)(1) to proscribe the kidnapping for rape of an incapacitated person, as to find otherwise would be absurd." (*Ibid.*) The Court of Appeal

concluded that the statute was violated "when a defendant takes and carries away an incapacitated person to commit rape even if the defendant uses only the force necessary to accomplish such a taking and carrying away." (*Id.* at p. 333.)

The Court of Appeal in *Daniels* correctly synthesized our holdings in *Michele D.* and *Oliver*. *Michele D.* approved the relaxed force requirement for infants and children. (*Michele D., supra,* 29 Cal.4th at p. 610.) *Oliver* drew a direct connection between infants and children, on one hand, and adults "who by reason of extreme intoxication, delirium or unconsciousness from injury or illness [are] unable to give [their] consent," on the other. (*Oliver, supra,* 55 Cal.2d at p. 765.) While children and mentally impaired adults may not be similar in all respects, they are similarly vulnerable to kidnapping and equally unable to consent to being moved, so the relaxed force requirement applies to each.

Lewis accepts the holding in *Daniels*, but he contends it is factually distinguishable. The majority below likewise found *Daniels* inapposite because, "Unlike the victim in *Daniels*, [S.D.] was not lying face down on the bar unable to move or talk. At various points [S.D.] leaned on the bar and swerved. But she talked to Lewis and [her date], and she was able to stand without assistance. She walked out of Rudy's on her own. The video does not show a person who was unable to stand on her own and needed to be helped out of the bar. Indeed, [the bartender] said that although she had concerns about [S.D.'s] sobriety, she did not look 'completely out of control.' " (*Lewis, supra,* 72 Cal.App.5th at p. 15.)

While we agree the victim in *Daniels* likely was more intoxicated than S.D., at least at the moment S.D. left Rudy's,

*Daniels* itself did not require such a high degree of intoxication. Instead, the relaxed force standard in *Daniels* depended on the ability of the victim to legally consent. (*Daniels*, *supra*, 176 Cal.App.4th at p. 325 [" 'A person with a mental impairment may include unconscious or intoxicated adults incapable of giving legal consent' "].) The inability to legally consent does not require total incapacitation or unconsciousness. The instructions in *Daniels* went on to explain, " 'The person is incapable of giving legal consent if he or she is unable to understand the act, its nature, and possible consequences.' " (*Ibid.*; accord, *People v. Griffin* (1897) 117 Cal. 583, 585 ["legal consent presupposes an intelligence capable of understanding the act, its nature, and possible consequences"].)

This focus on consent is consistent with the rule in *Oliver*, which applied to any person who, "because of infancy or mental condition, *is incapable of giving his consent.*" (*Oliver*, *supra*, 55 Cal.2d at p. 766, italics added; accord, *People v. Westerfield* (2019) 6 Cal.5th 632, 714 (*Westerfield*).) *Michele D.* reasoned that *Oliver*'s discussion of consent led directly to a relaxed element of force "because the consent and force elements of kidnapping are clearly intertwined." (*Michele D.*, *supra*, 29 Cal.4th at p. 609.) "If a person's free will was not overborne by the use of force or the threat of force, there was no kidnapping." (*People v. Moya* (1992) 4 Cal.App.4th 912, 916; see *Michele D.*, at p. 609.) But a person who cannot legally consent has no true free will that can be overborne. In that situation, even though "there is no evidence the victim's will was overcome by force" (*Michele D.*, at p. 609), kidnapping is established by proof that the victim was taken "for an illegal purpose or with an illegal intent" (*id.* at p. 610).

We applied a similar principle more than a century ago in *People v. Verdegreen* (1895) 106 Cal. 211 (*Verdegreen*). The defendant in *Verdegreen* was convicted of an assault with intent to rape. (*Id.* at p. 212.) The record showed that the victim, a seven-year-old girl, went willingly with the defendant. (*Ibid.*) The defendant recognized that the victim could not legally consent to sexual intercourse, but he argued that assault was different because it "implies resistance on the part of the one assaulted." (*Id.* at p. 213.) The court in *Verdegreen* was not persuaded: "It is true that an assault implies force by the assailant and resistance by the one assaulted; and that one is not, in legal contemplation, injured by a consensual act. But these principles have no application to a case where under the law there can be no consent." (*Id.* at p. 215; accord, *People v. Soto* (2011) 51 Cal.4th 229, 248.)

*Verdegreen* illuminates the connection between force and consent. "[T]he concepts of consent and force or fear 'are clearly intertwined.'" (*Majors, supra,* 33 Cal.4th at p. 327.) Normally, "'If a person's free will was not overborne by the use of force or the threat of force, there was no kidnapping.'" (*Hill, supra,* 23 Cal.4th at p. 856.) But where a victim is unable to legally consent, and has no true free will, the traditional force requirement loses its salience. "[W]here the victim by reason of youth or mental incapacity can neither give nor withhold consent," kidnapping is established by proof that the victim was taken for an illegal purpose or with an illegal intent, even if "there is no evidence the victim's will was overcome by force." (*Michele D., supra,* 29 Cal.4th at p. 609.) The law protects the victim, who may go willingly with the defendant because he or she is unable to appreciate the defendant's illegal intent. (*Verdegreen, supra,* 106 Cal. at p. 215.)

We are confident the Legislature intended this result. " 'It would ill serve the law to exclude as kidnappers those who prey on persons who cannot resist.' " (*Michele D.*, *supra*, 29 Cal.4th at p. 610, fn. 3, quoting *Stancil v. Maryland* (1989) 78 Md.App. 376, 386 [553 A.2d 268, 273].) As the Court of Appeal in *Daniels* explained, "An interpretation of . . . section 209, subdivision (b)(1) to avoid the absurd consequence of allowing a defendant to escape liability for carrying off an incapacitated person for the purpose of rape serves the legislative purpose underlying the statute, just as the California Supreme Court's construction of . . . section 207 did in *Michele* [*D*]." (*Daniels*, *supra*, 176 Cal.App.4th at p. 332.)[6]

Lewis contends the Legislature's codification of *Michele D.*'s relaxed force requirement for *children* precludes its application to *adults*. We disagree. Lewis's contention rests on the incorrect premise that the Legislature chose to change the law of kidnapping as it applied to children, but not as to adults. The Legislature expressly stated that its amendment "codifies the holding in [*Michele D.*], and does *not* constitute a change in existing law." (Stats. 2003, ch. 23, § 2, p. 99, italics added.) The Legislature's decision to codify the specific holding of *Michele D.* does not imply its disapproval of other developments in the law of kidnapping, and it does not dictate how the force requirement

---

[6] Although it should be obvious, we emphasize the requirement that a defendant act with illegal intent or for an illegal purpose to be liable for kidnapping an *unresisting* intoxicated victim does not necessarily mean that a defendant who kidnaps a *resisting* intoxicated victim must act with such a specific intent. (See *People v. Hartland* (2020) 54 Cal.App.5th 71, 78–79 [a defendant who kidnaps a resisting intoxicated victim need only act with general intent].) The latter situation is materially different, and we need not consider it here.

should be interpreted in situations not covered by the amendment. Indeed, the Legislature's action was prompted by *Michele D.*, and not the later opinion in *Daniels* or any other similarly direct authority considering the specific circumstance of a mentally impaired adult. It is therefore unremarkable the Legislature did not address that circumstance. "The fact that the Legislature may not have considered every factual permutation of kidnapping . . . does not mean the Legislature did not intend for the statute to reach that conduct." (*Michele D.*, *supra*, 29 Cal.4th at p. 606.)

Lewis also contends application of the relaxed force requirement here would constitute an improper judicial expansion of criminal liability in contravention of the Legislature's exclusive power to define crimes in California. (Cf. *Keeler v. Superior Court* (1970) 2 Cal.3d 619, 631–632.) Lewis is incorrect. Our decision today falls well within the proper role of the judiciary. Section 207 requires "force," but the Legislature has not defined the term. *Michele D.* explored its meaning with respect to infants and children who, by virtue of their youth, are legally unable to consent; we do the same here for intoxicated adults who, by virtue of their impaired mental state, are similarly unable to consent. Our purpose is to effectuate the intent of the Legislature, not thwart it. Our opinions in *Oliver* and *Michele D.*, and that of the Court of Appeal in *Daniels*, lead directly to the conclusion that the Legislature intended to criminalize the kidnapping of an intoxicated adult victim, who is unable to legally consent, where the kidnapper has an illegal purpose or intent. This conclusion

does not expand the scope of the statute. It interprets the statute as it already exists.[7]

For similar reasons, we disagree that the application of the relaxed force requirement here is unforeseeable and would violate due process. "[A]n unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an *ex post facto* law . . . ." (*Bouie v. City of Columbia* (1964) 378 U.S. 347, 353.) "The fundamental principle that 'the required criminal law must have existed when the conduct in

---

[7] We note the jury instructions here did not merely articulate the relaxed force standard. The instructions specifically required the prosecution to show that Lewis "knew or reasonably should have known that [S.D.] was a person with a mental impairment." The parties agreed to this instruction in the trial court, and the Attorney General concurs it was properly given under the circumstances. It reflects the general principle that an alleged kidnapper must harbor at least "criminal negligence as to consent." (*People v. Fontenot* (2019) 8 Cal.5th 57, 68.) Where, as here, a victim lacks the ability to consent, this principle requires that the defendant knew or should have known of the victim's impaired state. A defendant is not liable for kidnapping a mentally impaired adult if the defendant actually and reasonably believed the victim was not a mentally impaired person. This requirement applies to the aggravated kidnapping of a mentally impaired adult alleged here (§ 209, subd. (b)), as well as the simple kidnapping of a mentally impaired adult (§ 207, subd. (a)). Jury instructions like CALCRIM No. 1201 that do not explicitly recite this requirement, but rely on the relaxed force concept for kidnapping a mentally impaired adult, risk materially misstating the law. On a separate matter, we have no occasion here to consider the precise nature of the additional required mental state — illegal intent or illegal purpose — that is required in the relaxed force context. (See *People v. Singh* (2019) 42 Cal.App.5th 175, 181–183.) The intent to rape certainly suffices.

issue occurred,' [citation], must apply to bar retroactive criminal prohibitions emanating from courts as well as from legislatures. If a judicial construction of a criminal statute is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue,' it must not be given retroactive effect." (*Id.* at p. 354.)

Our interpretation of the kidnapping statute is neither unexpected nor indefensible. It is based on the principles of *Verdegreen*, *Oliver*, and *Michele D. Verdegreen* established the connection between force and consent. (*Verdegreen*, *supra*, 106 Cal. at p. 215.) *Oliver* identified a kidnapping as "forcibl[e]" even though the child went willingly with the defendant. (*Oliver*, *supra*, 55 Cal.2d at p. 765.) It drew an explicit connection between that situation and a mentally impaired victim unable to consent; its holding applied to any victim "who by reason of immaturity *or mental condition* is unable to give his legal consent." (*Id.* at p. 768, italics added.) Even before *Michele D.*, we recognized that *Oliver* indicated " 'the requirement of force may be relaxed' " where the victim is a child and unable to consent. (*Hill*, *supra*, 23 Cal.4th at p. 857.) *Michele D.* confirmed this relaxed standard of force for infants and small children. (*Michele D.*, *supra*, 29 Cal.4th at p. 610.)

Given the principles of *Verdegreen* and *Oliver*, it was foreseeable that *Michele D.*'s holding would be applied to mentally impaired adults. Indeed, the Court of Appeal in *Daniels* had no trouble doing so: "[U]nder the rationale of *Michele* [*D.*], it is our 'duty' to construe . . . section 209, subdivision (b)(1) to proscribe the kidnapping for rape of an incapacitated person, as to find otherwise would be absurd. . . . '[O]rdinarily the force element in section 207 requires *something more* than the quantum of physical force necessary to effect

movement of the victim from one location to another.' [Citation.] Since an incapacitated person, like an infant, has no ability to resist being taken and carried away, the 'something more' that is 'ordinarily' required is not necessary, and 'the amount of force required to kidnap an [incapacitated person] is simply the amount of physical force required to take and carry the [incapacitated person] away . . . with an illegal intent.' " (*Daniels*, *supra*, 176 Cal.App.4th at p. 332.)

While we have never explicitly applied the relaxed standard of force to intoxicated adult victims before today, we also have never indicated to the contrary. (Cf. *Martinez*, *supra*, 20 Cal.4th at p. 241.) Instead, the clear import of *Verdegreen*, *Oliver*, and *Michele D.* is that the relaxed standard of force would apply. We have consistently treated children and mentally impaired adults differently from unimpaired adults for purposes of the kidnapping statute, and specifically its force requirement, and our case law provides more than sufficient warning that Lewis's conduct here was criminal.

In sum, a defendant acting with an illegal intent or purpose may be liable for kidnapping under section 207 if he or she uses physical force to take and carry away a person who, because of intoxication or other mental condition, is unable to consent to the movement. The quantum of force required is no greater than the amount of physical force required to take and carry the victim away a substantial distance, and there is no constitutional prohibition on applying that standard here.

## B. Instructional Error and Prejudice

The jury was instructed that Lewis was guilty of kidnapping if he "used physical force *or deception*" to take and carry away S.D. (Italics added.) As noted, we assume without

28

deciding that the trial court erred by including deception as an alternate theory of kidnapping. Under this assumption, a valid theory of kidnapping in this context requires force, albeit the relaxed standard we have discussed: physical force sufficient to take and carry away the victim a substantial distance for an illegal purpose or with an illegal intent. (See *Michele D.*, *supra*, 29 Cal.4th at p. 610; *Daniels*, *supra*, 176 Cal.App.4th at pp. 324–325.)

The Attorney General contends that the instructions as a whole were not erroneous because they adequately conveyed the relaxed force requirement, notwithstanding the inclusion of deception as an alternative. "A claim of instructional error is reviewed de novo. [Citation.] An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law. [Citation.] In reviewing a claim of instructional error, the court must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution. [Citations.] The challenged instruction is viewed 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)

To support his claim that the jury instructions as a whole were not misleading, the Attorney General points to a different requirement in the instructions that Lewis must have "moved" S.D. "a substantial distance." The Attorney General asserts, "The instruction on the third element expressly conditioned guilt on a finding that [Lewis] 'moved' [S.D.] — which could only happen through the application of force." Lewis responds that the term "move" could include a situation where a person caused

another to move by instilling fear or deceiving the victim. In Lewis's view, the jury could have understood the term to include indirect movement without any application of physical force.

We need not definitively resolve whether a jury would have viewed the instructions as the Attorney General suggests. Even assuming the instructions did not adequately convey the force requirement to the jury, any error was harmless beyond a reasonable doubt. The assumed error here is a form of alternative-theory error because it is premised on the idea that the jury may have found Lewis guilty based on an invalid theory of deception rather than a valid theory of force. An alternative-theory error is a federal constitutional error, subject to review for harmlessness under *Chapman v. California* (1967) 386 U.S. 18, 24. Under this standard, "The reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*Aledamat, supra*, 8 Cal.5th at p. 13.)

We have confirmed that "no higher standard of review applies to alternative-theory error than applies to other misdescriptions of the elements. The same beyond a reasonable doubt standard applies to all such misdescriptions, including alternative-theory error." (*Aledamat, supra*, 8 Cal.5th at p. 9.) The fundamental question is whether "it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error." (*People v. Merritt* (2017) 2 Cal.5th 819, 831; accord, *Neder v. United States* (1999) 527 U.S. 1, 18 (*Neder*).) "In determining . . . whether the error was harmless, the reviewing court is not limited to a review of the verdict itself." (*Aledamat*, at p. 13.) A court may examine "the entire cause, including the evidence." (*Ibid.*)

We recently explained, "To determine harmlessness under *Aledamat*, a reviewing court essentially asks whether any rational juror who made the findings reflected in the verdict and heard the evidence at trial could have had reasonable doubt regarding the findings necessary to convict the defendant on a valid theory. 'The reviewing court examines what the jury necessarily did find and asks whether it would be impossible, on the evidence, for the jury to find *that* without *also* finding the missing fact as well.' " (*Lopez, supra,* 14 Cal.5th at p. 591.)[8]

Here, under the trial court's instructions, the jury was required to find that Lewis intended to commit the offense of rape of an intoxicated woman, he moved S.D. a substantial distance, and S.D. was moved (or was "made to move") a distance beyond that merely incidental to the commission of the intended offense. By its guilty verdict, we know the jury did so. The jury also found this movement involved "more than slight or trivial distance." It "increased the risk of physical or

---

[8] Lewis takes issue with this articulation of the standard of prejudice. He asserts that a reviewing court can only examine what the jury actually did, rather than what a reasonable jury would do if properly instructed. We addressed and rejected this assertion in *Aledamat.* We disagreed that an alternative-theory error "requires reversal unless there is a basis in the record to find that 'the jury has "*actually*" relied upon the valid theory.' " (*Aledamat, supra,* 8 Cal.5th at p. 9.) Instead, we held an alternative-theory error harmless where " '[n]o reasonable jury' " could have made the findings reflected in its verdict without finding the omitted element as well. (*Id.* at p. 15.) We recently confirmed and expanded on this principle. (*Lopez, supra,* 14 Cal.5th at pp. 580–581.) Lewis's reliance on the United States Supreme Court's opinion in *Sullivan v. Louisiana* (1993) 508 U.S. 275 for a different standard is unavailing for the reasons we explained in *Lopez,* at pages 583 to 584.

psychological harm to [S.D.] beyond that necessarily present in the rape of a woman while intoxicated."

Additionally, it was undisputed at trial that Lewis used some quantum of physical force to move S.D. The record does not support a contrary finding. (See *Neder*, *supra*, 527 U.S. at p. 19.) Lewis admitted driving S.D. away from Rudy's, and the act of driving necessarily involved the application of physical force to S.D. under the relaxed force standard in *Michele D.* (See *Lewis*, *supra*, 72 Cal.App.5th at p. 33 (conc. & dis. opn. of Bedsworth, J.) ["By driving [S.D.] away from the bar, [Lewis] clearly and indisputably used enough force to move her a substantial distance while the kidnapping was in progress"].) S.D. did not move herself; she was moved by the car driven by Lewis. Lewis used the car to apply physical force to S.D. and carry her away. Just as a person might kidnap an infant by pushing the child away in her stroller, so too did Lewis kidnap S.D. by driving her away in his car. (See *Westerfield*, *supra*, 6 Cal.5th at pp. 714–715; see also *Hill*, *supra*, 23 Cal.4th at pp. 857–858 ["The baby certainly did not move herself"].) The relaxed force requirement does not demand that the kidnapper touch his or her victim directly. Thus, even if Lewis used deception to persuade S.D. to accompany him, he still indisputably used physical force as well — i.e., his act of driving S.D. — to accomplish the kidnapping under the relaxed force standard.[9]

---

[9] We are aware that an argument could be made that *Michele D.*'s relaxed force requirement includes "physically escorting" the victim to a remote location for an illegal purpose or with an illegal intent. (*People v. Dalerio* (2006)

Based on this evidence, any rational juror who made the findings reflected in the verdict would necessarily have found that Lewis used some quantum of physical force to move S.D. as well. (See *Lopez, supra*, 14 Cal.5th at p. 580.) Because "any rational juror would have made the additional findings, based on the jury's actual verdict and the evidence at trial, the error is harmless because the presentation of the invalid theory to the jury made no difference. The error did not contribute to the verdict." (*Id.* at p. 589.)[10]

Lewis claims this showing is insufficient because "there is no evidence that [S.D.] was incapacitated when she and [Lewis] drove away from the bar." (Fn. omitted.) As an initial matter, the standard is not "incapacitat[ion]," but the inability to give legal consent due to mental condition or impairment, as we have discussed. Moreover, although we may assume the jury instructions allowed the jury to rely on deception rather than force, the instructions did not eliminate the requirement of mental impairment. The instructions required the jury to find

144 Cal.App.4th 775, 782; see also *Oliver, supra*, 55 Cal.2d at pp. 764–765.) Because we conclude Lewis used physical force to move S.D., we need not consider whether "physically escorting" S.D. would be sufficient as well. (*Dalerio*, at p. 782.) We express no opinion on this theory or its potential applications. We also express no opinion about whether the phrase "relaxed force" fully captures the relevant showing, or whether a broader term would be more appropriate.

[10] Lewis contends the error was not harmless beyond a reasonable doubt because "the prosecution relied heavily" on the theory of deception during its opening and closing arguments. But, as we recently explained, "[t]he prosecutor's mere reliance on an invalid theory will not overcome a showing of harmlessness under *Neder* and *Aledamat*." (*Lopez, supra*, 14 Cal.5th at p. 590.)

that Lewis "used physical force or deception to take and carry away an unresisting person *with a mental impairment*." (Italics added.) This requirement was repeated in the two subsequent instructions relating to movement: "acting with [intent to rape an intoxicated person], the defendant moved the person *with a mental impairment* a substantial distance," and "the person *with a mental impairment* was moved or made to move a distance beyond that merely incidental to the commission of a rape of a woman while intoxicated." (Italics added.) The jury further found that S.D. was a mentally impaired person: she "suffered from a mental impairment that made her incapable of giving legal consent to the movement." Thus, the jury found beyond a reasonable doubt that S.D. was mentally impaired at the relevant time, regardless of whether it thought Lewis used force or deception to move her. As the separate opinion below explained, "In finding [Lewis] guilty of kidnapping for rape, the jury necessarily determined that [S.D.] was mentally incapacitated due to intoxication and that [Lewis] intended to rape her in that condition when they left the bar together." (*Lewis, supra*, 72 Cal.App.5th at p. 33 (conc. & dis. opn. of Bedsworth, J.).)

Given the jury's findings, Lewis's claim amounts to a challenge to the sufficiency of the evidence supporting the jury's verdict. Lewis raised at least two sufficiency of the evidence challenges in the Court of Appeal, including this one, but the majority found it unnecessary to address them because it found prejudicial instructional error. (See *Lewis, supra*, 72 Cal.App.5th at p. 18.) We need not address them in the first instance here. We therefore reverse the judgment of the Court of Appeal and remand for further proceedings, including any appellate contentions that remain unresolved.

## III. CONCLUSION

We reverse the judgment of the Court of Appeal and remand the matter for further proceedings consistent with this opinion.

**GUERRERO, C. J.**

**We Concur:**

**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**EVANS, J.**

PEOPLE v. LEWIS

S272627

Concurring Opinion by Justice Kruger

At the trial of defendant Rodney Taurean Lewis, the court instructed the jury it could convict Lewis of aggravated kidnapping if it determined that Lewis used "physical force or deception" to take and carry away S.D., an adult woman impaired by intoxication, with the intent to rape her. The parties agree, at least for the purposes of this case, that the trial court erred by instructing the jury it could convict Lewis if it was convinced that he had tricked S.D. into accompanying him. The majority concludes that the purported error in instructing on a kidnapping-by-deception theory was harmless: Any reasonable juror that found Lewis guilty of kidnapping S.D. under the instructions that were given necessarily would have found that he technically used "some quantum of physical force" inasmuch as he took and carried her away by driving her in his car. (Maj. opn., *ante*, at p. 3; see *id.* at pp. 2–3.)

I agree with the majority that any instructional error was harmless, and I join its opinion in full. I write separately to make two points about what the majority opinion says — and, importantly, what it does not say — about the substantive law governing the kidnapping of young children and intoxicated or otherwise impaired adults.

## I.

The first point concerns the criminal act, or actus reus, constituting the kidnapping of a young child or an impaired

1

adult.  Because the Attorney General has conceded it was error to instruct the jury on a kidnapping-by-deception theory, the majority opinion does not address the issue.  But to be clear, this silence is not an endorsement:  Whether the kidnapping of young or impaired victims can be accomplished by deception — or, for that matter, by any other means not involving technical uses of physical force — remains an open and significant question.

Our precedent does make clear that the crime of kidnapping typically cannot be accomplished by deception alone. Penal Code section 207, subdivision (a) provides that a kidnapping must be accomplished "forcibly, or by any other means of instilling fear," and Penal Code section 209, the aggravated kidnapping statute, incorporates the same requirement (*People v. Daniels* (1969) 71 Cal.2d 1119, 1131 (*Daniels*)).  We have interpreted the force element of this force-or-fear requirement to mean that kidnapping typically requires the use of actual physical force, and we have not considered that element satisfied by mere technical uses of force.  In *People v. Stephenson* (1974) 10 Cal.3d 652, for example, the defendant tricked the victims into accepting a ride home from the airport in his car, drove to a secluded location, and then robbed them of their belongings.  (*Id.* at p. 657.)  We held that the victims "were enticed to get voluntarily into defendant's car by deceit or fraud" and that because he "did not forcibly require any of them to enter his car initially," the charged offenses did not meet the statutory definition of kidnapping.  (*Id.* at pp. 659–660; see *People v. Majors* (2004) 33 Cal.4th 321, 327.)

That is the rule that governs the typical kidnapping case. But our precedent also makes clear that cases involving young children and impaired adults are not typical cases.  When

victims lack the ability to understand what is happening to them, whether because of their young age or mental condition, the law does not insist on the same force-or-fear showing as would be required in kidnapping cases involving victims who are legally capable of consenting to movement.  In the seminal case of *People v. Oliver* (1961) 55 Cal.2d 761 (*Oliver*), the defendant led a two-year-old boy away by the hand, taking him from an alley at the back of his home behind a fence somewhere nearby. (*Id.* at p. 763.)  We noted that the child "went willingly with [the] defendant," but because the child was "too young to give his legal consent to being taken," we took the view that the defendant's conduct would be sufficient to establish the actus reus element of kidnapping.  (*Id.* at p. 764; see *id.* at pp. 764–765.)  We thus concluded, at least implicitly, that leading the willing child away by the hand satisfied the statute's requirement of a forcible taking.  We reversed the defendant's kidnapping conviction, however, because the jury had not been instructed that the defendant must take the child for an unlawful purpose.  (*Id.* at p. 768.)  We interpreted the statute to require this unlawful intent in order to ensure that a defendant who moved a child without consent but for "a good or innocuous purpose" could not be convicted of kidnapping.  (*Id.* at p. 765.)  And we noted that the same considerations should govern the substantive law of kidnapping in cases involving adult victims "who by reason of extreme intoxication, delirium or unconsciousness from injury or illness" are similarly unable to consent to being moved. (*Ibid.*)

We again considered the law governing the kidnapping of small children in *In re Michele D.* (2002) 29 Cal.4th 600 (*Michele D.*), where we more directly addressed the force-or-fear requirement.  In that case, the defendant conceded that she had

taken a 12-month-old child from a stroller and carried the child away, but she argued that there was insufficient evidence to support her kidnapping conviction because she had not taken the child "forcibly," as that term is used in Penal Code section 207, subdivision (a). We rejected the argument. In interpreting the statute's force-or-fear requirement, we sought to avoid the "absurd consequence of allowing a defendant who carries off an infant or small child . . . to escape liability." (*Michele D.*, at p. 613.) We thus concluded that "the amount of force required to kidnap an unresisting infant or child is simply the amount of physical force required to take and carry the child away a substantial distance for an illegal purpose or with an illegal intent." (*Id.* at p. 610.)

This holding is what the majority opinion refers to as *Michele D.*'s "relaxed" or "reduced" force standard. (Maj. opn., *ante*, at pp. 27, 19.) In conceding the jury was wrongly instructed here, the Attorney General appears to assume this "relaxed" force standard requires the use of actual physical force, if only in a technical sense. This is understandable: *Michele D.* does seem to suggest that some "amount of physical force" is required (*Michele D., supra*, 29 Cal.4th at p. 610) — if only the amount of force necessary to lift an unresisting small child from a stroller. But there are also reasons to doubt whether the law draws a firm line between technical uses of force and other ways of moving a victim. After all, *Michele D.* sought to avoid an absurd construction of the statute that would have permitted a defendant who picks up an unresisting small child and carries the child away to avoid liability. But it would also seem odd to interpret the statute in a way that fails to reach the defendant who lures a young child away with false promises of ice cream or puppies, without ever exerting the physical force

necessary to hold a hand or push a stroller. (Cf. *People v. Dalerio* (2006) 144 Cal.App.4th 775, 777–778 [holding that the evidence of kidnapping sufficed to satisfy the corpus delicti rule where the defendant "deceived a nine-year-old child into voluntarily accompanying him" by telling her that her friends were nearby "looking at a deer" and then "physically escorted" her to a remote location]; but see *People v. Nieto* (2021) 62 Cal.App.5th 188, 197 [holding that deception is not an alternative to force under the general kidnapping statute in a case involving a six-year-old victim].) As the majority explains, in cases where the victim is a small child or suffers from a mental impairment, it is the victim's inability to consent that justifies a departure from the ordinary standard of force. (Maj. opn., *ante*, at p. 22.) A defendant who moves such a victim for an unlawful purpose would seem equally blameworthy, regardless of whether the movement was accomplished through the use of force in a technical sense, deception, or some other means.

Perhaps for that reason, although *Michele D.* contains language suggesting that some amount of physical force is required, it also suggests that "kidnapping is established by proof that the victim was taken for an improper purpose or improper intent" even where "there is no evidence the victim's will was overcome by force." (*Michele D.*, *supra*, 29 Cal.4th at p. 609; see *id.* at p. 612, fn. 5 [noting that this holding "affects only a narrow class of cases in which an unresisting infant or small child is taken away without any force or fear"].) We similarly suggested in *People v. Westerfield* (2019) 6 Cal.5th 632 that physical force is not necessarily required, holding that a kidnapping conviction for the taking of a seven-year-old child could stand "even assuming [the victim] had been moved by a ruse and not through force or fear." (*Id.* at p. 713.)

The majority opinion takes no sides on this issue, instead concluding any instructional error was harmless because "it was undisputed at trial that Lewis used some quantum of physical force to move S.D." (Maj. opn., *ante*, at p. 32.) The majority explains: "Lewis admitted driving S.D. away from [the bar], and the act of driving necessarily involved the application of physical force to S.D. under the relaxed force standard in *Michele D.* [Citation.] S.D. did not move herself; she was moved by the car driven by Lewis. Lewis used the car to apply physical force to S.D. and carry her away. Just as a person might kidnap an infant by pushing the child away in her stroller, so too did Lewis kidnap S.D. by driving her away in his car." (*Ibid.*)

It is true that, as a matter of Newtonian physics, Lewis applied force to S.D.'s person by moving her in his car. But the question remains whether kidnapping liability in fact turns on this sort of technicality. One can easily conceive of ways that a person could accomplish the movement of an intoxicated or impaired person without any use of force at all. Imagine, for example, that instead of tricking an intoxicated victim into entering his car, the defendant persuaded her to walk with him to a nearby apartment. Or imagine that instead of taking the defendant's own car, the defendant hailed a cab or escorted her onto a city bus. In those scenarios, the defendant might not have deployed physical force to move his victim, but he would have *caused* her to move all the same. In all of these scenarios, the defendant has taken advantage of his victim's impairment to move her — by whatever means — to a location that " 'substantially increase[d] the risk of harm [to her] over and above that necessarily present in the crime' " of rape itself. (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1150, quoting *Daniels, supra,* 71 Cal.2d at p. 1139; cf. *People v. Martinez*

6

(1999) 20 Cal.4th 225, 236 ["a primary reason forcible asportation is proscribed by the kidnapping statutes is the increase in the risk of harm to the victim because of the diminished likelihood of discovery, the opportunity for the commission of additional crimes, and the possibility of injury from foreseeable attempts to escape"].)

Given the rationale underlying *Michele D.*, it could be argued that the operative standard under our precedent is best described not as a "relaxed" or "reduced" force standard, but as a *constructive* force standard — a standard that is satisfied so long as the defendant can be said to have caused the movement of a victim who, because of the victim's young age, state of intoxication, or other mental impairment, can neither effectively resist nor consent to the movement. (Cf. maj. opn., *ante*, at p. 23, quoting *People v. Verdegreen* (1895) 106 Cal. 211, 215 [" 'It is true that an assault implies force by the assailant and resistance by the one assaulted; and that one is not, in legal contemplation, injured by a consensual act. But these principles have no application to a case where under the law there can be no consent.' "].) As Justice Bedsworth explained in his opinion in the Court of Appeal, such an approach would mean there was no error in the jury instruction at issue here: In his view, the instruction properly "allowed the jury to find [the asportation] requirement satisfied upon proof that defendant took advantage of [S.D.]'s mental impairment by luring her out [of] the bar under false pretenses for the purpose of raping her." (*People v. Lewis* (2021) 72 Cal.App.5th 1, 32 (conc. & dis. opn. of Bedsworth, J.).) And if that is so, then it does not matter whether Lewis happened to accomplish the movement through the technical use of force.

Again, it is unnecessary to decide the issue in this case, so the majority does not decide it. But the majority's willingness to assume, for the sake of argument, that the kidnapping-by-deception instruction was invalid should not be mistaken for a judicial determination of invalidity. The question whether kidnapping liability exists only if the defendant can be shown to have used physical force to move the victim — even if only in a technical sense — is one that warrants further attention in an appropriate case.

## II.

The second point about the majority's treatment of the substantive law of kidnapping concerns the required mental state, or mens rea, in cases involving very young or impaired victims. As we have repeatedly recognized, with any reduced force requirement comes a danger of inadvertently criminalizing innocent — or even beneficial — behavior. To avoid that danger, our cases have made clear that, to establish kidnapping liability in the case of a young child or other person incapable of consenting to movement, the prosecution must prove the defendant's wrongful intent. (*Oliver*, *supra*, 55 Cal.2d at p. 768.)

In this case, the jury was told that, to convict, it must make another finding about Lewis's mental state: that he was actually or constructively aware of the impairment that rendered his victim incapable of consent. So instructed, the jury found that Lewis "knew or reasonably should have known" that S.D. "suffered from a mental impairment that made her incapable of giving legal consent to the movement."

As the majority notes, all agree that the instruction was appropriate, including the Attorney General. (Maj. opn., *ante*, at p. 26, fn. 7.) The instruction is consistent with our

explanation in *People v. Fontenot* (2019) 8 Cal.5th 57 of the mental state required for kidnapping: "Conviction under [Penal Code] section 207, subdivision (a) requires the defendant to intentionally perform the physical acts constituting the crime. And because any criminal conviction in California (with a few exceptions not applicable here) requires, as a threshold matter, ' "a union of act and wrongful intent" ' (*People v. Mayberry* (1975) 15 Cal.3d 143, 154 [125 Cal.Rptr. 745, 542 P.2d 1337] (*Mayberry*)) under [Penal Code] section 20, we have further concluded that someone with an honest and reasonable belief that the victim 'voluntarily consented to accompany him' (*Mayberry*, at p. 155) is not guilty of completed kidnapping. (See also [Pen. Code,] § 26, class Three [providing that someone is not guilty of a crime if they 'committed the act or made the omission charged under an ignorance or mistake of fact, which disproves any criminal intent'].) So to satisfy a basic requirement for criminality — that a defendant's mental state be culpable in some minimal way — completed kidnaping under [Penal Code] section 207, subdivision (a) requires not just the intentional commission of physical acts, but also — at least — criminal negligence as to consent. (*Mayberry*, at p. 154, citing *People v. Vogel* (1956) 46 Cal.2d 798, 801, fn. 2 [299 P.2d 850].)" (*Id.* at p. 68.)

This principle holds in cases involving the kidnapping of young children or mentally impaired adults. To be sure, as noted above, *Oliver* and *Michele D.* require the prosecution to prove that the defendant moved the young or impaired victim with an unlawful intent. (*Oliver, supra,* 55 Cal.2d at p. 768; *Michele D., supra,* 29 Cal.4th at p. 612.) And in an aggravated kidnapping case, the prosecution must prove that the defendant harbored a specific intent to commit one of a list of enumerated

crimes. (Pen. Code, § 209, subd. (b).) There is thus no danger of penalizing a defendant with entirely innocent intentions. But the actual or constructive knowledge requirement serves an important purpose, in that it ensures that the defendant harbored a culpable mental state specifically with respect to the act of taking and carrying away a victim who was unable either to consent or resist.

This mens rea requirement has particular salience in a case like this one, involving application of *Michele D.*'s modified force standard due to an adult victim's state of intoxication. Whereas children who are young enough to be taken without force, as conventionally understood, are always legally incapable of consent, the same is not true of adults. And it may sometimes be difficult to determine whether another adult has reached a level of impairment that would preclude giving legal consent to being moved. Without the requirement that the defendant act with at least criminal negligence as to the victim's capacity to consent, there is a danger the defendant could be liable for simple kidnapping merely for transporting an adult the defendant reasonably believed was coming along voluntarily, with any illegal intent or unlawful purpose (see *Michele D.*, *supra*, 29 Cal.4th at p. 612). And if the defendant harbored a specific intent to commit one of the additional crimes enumerated in Penal Code section 209, subdivision (b), there is likewise a danger the defendant could be liable for aggravated kidnapping for the same conduct, despite having no intention of moving the victim somewhere the victim had not agreed to go. As all parties here agree, the jury was properly instructed that they had to find more — that Lewis knew or should have known S.D. was intoxicated to a degree that rendered her unable to legally give consent — in order to return a conviction.

With these observations, I join the majority's opinion.


**KRUGER, J.**


**I Concur:**

**GROBAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Lewis

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 72 Cal.App.5th 1
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S272627
**Date Filed:** June 22, 2023

_____

**Court:**  Superior
**County:**  Santa Clara
**Judge:**  Vincent J. Chiarello

_____

**Counsel:**

Swanson & McNamara, Edward W. Swanson and August Gugelmann for Defendant and Appellant.

Rob Bonta and Xavier Becerra, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Alice B. Lustre, Seth K. Schalit and Arthur P. Beever, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

August Gugelmann
Swanson & McNamara LLP
300 Montgomery Street, Suite 1100
San Francisco, CA 94104
(415) 477-3800

Arthur P. Beever
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
(415) 510-3761